UNITED STATES of America,
Appellant,

v.

BAKER HUGHES INC., Eimco Secoma,
S.A., and Oy Tampella AB, Appellees.

No. 90–5060.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 16, 1990.

Decided July 6, 1990.

David Seidman, Atty., Dept. of Justice, with whom James F. Rill, Asst. Atty. Gen., Michael Boudin and Judy L. Whalley, Deputy Asst. Attys. Gen., and Catherine G. O'Sullivan, Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, were on the brief, for appellant.

David Marx, Jr., with whom Ronald A. Bloch, Lizbeth R. Levinson and Amy E. Hancock, for Oy Tampella AB and Eimco Secoma, S.A., and William J. Baer, with whom Randal M. Shaheen for Baker Hughes Inc., were on the joint brief, for appellees.

Before RUTH B. GINSBURG, SENTELLE, and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge CLARENCE THOMAS.

CLARENCE THOMAS, Circuit Judge:

Appellee Oy Tampella AB, a Finnish corporation, through its subsidiary Tamrock AG, manufactures and sells hardrock hydraulic underground drilling rigs (HHUDRs) in the United States and throughout the world. Appellee Baker Hughes Inc., a corporation based in Houston, Texas, owned a French subsidiary, Eimco Secoma, S.A. (Secoma), that was similarly involved in the HHUDR industry. In 1989, Tamrock proposed to acquire Secoma.

The United States challenged the proposed acquisition, charging that it would substantially lessen competition in the United States HHUDR market in violation of section 7 of the Clayton Act, 15 U.S.C. § 18.[1] In December 1989, the government sought and obtained a temporary restraining order blocking the transaction. *See* Temporary Restraining Order, *United States v. Baker Hughes Inc.*, No. 89–03333 (D.D.C. Dec. 15, 1989). In February 1990, the district court held a bench trial and issued a decision rejecting the government's request for a permanent injunction and dismissing the section 7 claim. *See United States v. Baker Hughes Inc.*, 731 F.Supp. 3 (D.D.C.1990). The government immediately appealed to this court, requesting expedited proceedings and an injunction pending appeal. We granted the motion for expedited briefing and argument, but denied the motion for an injunction pending appeal. The appellees consummated the acquisition shortly thereafter.

The basic outline of a section 7 horizontal acquisition case is familiar. By showing that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area,[2] the government establishes a presumption that the transaction will substantially lessen competition. *See United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 120–22, 95 S.Ct. 2099, 2118–19, 45 L.Ed.2d 41 (1975); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963). The burden of producing evidence to rebut this presumption then shifts to the defendant. *See, e.g., United States v. Marine Bancorporation*, 418 U.S. 602, 631, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974);

---

**1.** Section 7 prohibits mergers and acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

**2.** The parties in this case do not seriously contest the district court's definition of the relevant markets. The court defined the geographic market as the entire United States, *see* 731 F.Supp. at 5–6, and the relevant product as three types of HHUDRs: face drills ("jumbos"), longhole drills, and roof-bolting drills, as well as associated spare parts, components, and accessories, and used drills. *See id.* at 4, 6–8.

Although the appellees quibble with the court's product market definition, they conclude that "the [district] court's product market definition *presages* its finding that the extent of present competition and ease of entry preclude finding a violation of Section 7." Brief for Appellees at 10 (emphasis added). If the appellees believe that the court's product market definition contributed to their victory, we see no reason to address their halfhearted and contradictory challenges to that definition.

*United States v. General Dynamics Corp.*, 415 U.S. 486, 496–504, 94 S.Ct. 1186, 1193–97, 39 L.Ed.2d 530 (1974); *Philadelphia Bank*, 374 U.S. at 363, 83 S.Ct. at 1741. If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times. *See Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1340 & n. 12 (7th Cir.1981).

By presenting statistics showing that combining the market shares of Tamrock and Secoma would significantly increase concentration in the already highly concentrated United States HHUDR market, the government established a prima facie case of anticompetitive effect.[3] The district court, however, found sufficient evidence that the merger would not substantially lessen competition to conclude that the defendants had rebutted this prima facie case. The government did not produce any additional evidence showing a probability of substantially lessened competition, and thus failed to carry its ultimate burden of persuasion.

■ In this appeal, the government assails the court's conclusion that the defendants rebutted the prima facie case. Doubtless aware that this court will set aside the district court's findings of fact only if they are clearly erroneous, *see* Fed. R.Civ.P. 52(a), the government frames the issue as a pure question of law, which we review de novo. The government's key contention is that the district court, which did not expressly state the legal standard that it applied in its analysis of rebuttal evidence, failed to apply a sufficiently stringent standard. The government argues that, as a matter of law, section 7 defendants can rebut a prima facie case *only by a clear showing that entry into the market by competitors would be quick and effective.* Because the district court failed to apply this standard, the government submits, the court erred in concluding that the proposed acquisition would not substantially lessen future competition in the United States HHUDR market.

We find no merit in the legal standard propounded by the government. It is devoid of support in the statute, in the case law, and in the government's own Merger Guidelines. Moreover, it is flawed on its merits in three fundamental respects. First, it assumes that ease of entry by competitors is the *only* consideration relevant to a section 7 defendant's rebuttal. Second, it requires that a defendant who seeks to show ease of entry bear the onerous burden of proving that entry will be "quick and effective." Finally, by stating that the defendant can rebut a prima facie case only by a *clear* showing, the standard in effect shifts the government's ultimate burden of persuasion to the defendant. Although the district court in this case did not expressly set forth a legal standard when it evaluated the defendants' rebuttal, we have carefully reviewed the court's thorough analysis of competitive conditions in the United States HHUDR market, and we are satisfied that the court effectively applied a standard faithful to section 7.[4]

---

**3.** From 1986 through 1988, Tamrock had an average 40.8% share of the United States HHUDR market, while Secoma's share averaged 17.5%. 731 F.Supp. at 6. In 1988 alone, the two firms enjoyed a combined share of 76% of the market. (The district court inaccurately calculated this figure as 66%. *See id.* at 10; Brief for Appellant at 10 n. 10; Brief for Appellees app. A.) The acquisition thus has brought about a dramatic increase in the Herfindahl–Hirschman Index (HHI)—a yardstick of concentration—for this market. The Department of Justice's Merger Guidelines characterize as "highly concentrated" any market in which the HHI exceeds 1800. *See* United States Dep't of Justice, Merger Guidelines § 3.1 (June 14, 1984),

*reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20,561–64 (1988). This acquisition has increased the HHI in this market from 2878 to 4303. Brief for Appellant at 5 n. 3, 12 (calculated from 1986–1988 figures; *see* 731 F.Supp. at 6).

**4.** Even if we found more impressive the argument that the district court did not clearly articulate the legal standard applicable to a section 7 rebuttal, it would remain open to us to affirm that court's judgment. *Cf. Nelson v. United States*, 838 F.2d 1280, 1285 (D.C.Cir.1988) ("[W]e may affirm a trial court's decision on a basis not relied on by the district court where that ground finds support in the record.") (citation omitted).

Concluding that the court applied this legal standard to factual findings that are not clearly erroneous, we affirm the court's denial of a permanent injunction and its dismissal of the government's section 7 claim.

I.

It is a foundation of section 7 doctrine, disputed by no authority cited by the government, that evidence on a variety of factors can rebut a prima facie case. These factors include, but are not limited to, the absence of significant entry barriers in the relevant market. In this appeal, however, the government inexplicably imbues the entry factor with talismanic significance. If, to successfully rebut a prima facie case, a defendant *must* show that entry by competitors will be quick and effective, then other factors bearing on future competitiveness are all but irrelevant. The district court in this case considered at least two factors in addition to entry: the misleading nature of the statistics underlying the government's prima facie case and the sophistication of HHUDR consumers. These non-entry factors provide compelling support for the court's holding that Tamrock's acquisition of Secoma was not likely to lessen competition substantially. We have concluded that the court's consideration of these factors was crucial, and that the government's fixation on ease of entry is misplaced.

Section 7 involves *probabilities*, not certainties or possibilities.[5] The Supreme Court has adopted a totality-of-the-circumstances approach to the statute, weighing a variety of factors to determine the effects of particular transactions on competition. That the government can establish a prima facie case through evidence on only one factor, market concentration, does not negate the breadth of this analysis. Evidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness; the Supreme Court has never indicated that a defendant seeking to rebut a prima facie case is restricted to producing evidence of ease of entry. Indeed, in numerous cases, defendants have relied entirely on non-entry factors in successfully rebutting a prima facie case.

In *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), for instance, the Supreme Court rejected the government's argument that a merger between two leading coal producers would violate section 7. Although the transaction would result in the two largest firms controlling about half of all sales in an industry that was already highly concentrated because of a rapid decline in the number of competitors, the defendants produced considerable evidence that the merger would not substantially lessen competition. One of the parties to the merger owned only minimal reserves of coal, an irreplaceable raw material, and had already committed these reserves through long-term contracts. This evidence led the Court to conclude that the government's statistics regarding concentration in the wake of the merger inaccurately portrayed the post-merger company's weak competitive stature, and that the defendants had therefore rebutted the prima facie case. *Id.* at 503–04, 94 S.Ct. at 1196–97. Nowhere did the Court consider barriers to entry.

Indeed, the Court in *General Dynamics* emphasized the comprehensive nature of a section 7 inquiry, quoting at length from its decision a decade earlier in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *See General Dynamics*, 415 U.S. at 498, 94 S.Ct. at 1194. In *Brown Shoe*, the Court applied section 7 stringently, holding that a merger that created a company with a 5% share of a highly fragmented market violated the statute. In arriving at this result, how-

**5.** *See Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1522–23, 8 L.Ed.2d 510 (1962) ("Congress used the words '*may be* substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a *probable* anticompetitive effect were to be proscribed by this Act.") (footnote omitted) (emphasis added).

ever, the Court stressed that a transaction must

be functionally viewed, in the context of its particular industry. That is, whether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed foreclosure of business, that had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account.

370 U.S. at 321–22, 82 S.Ct. at 1521–22 (footnote omitted).[6] All these factors are relevant in determining whether a transaction is likely to lessen competition substantially, but none is invariably dispositive. *See* Note, *Horizontal Mergers After* United States v. General Dynamics Corp., 92 Harv.L.Rev. 491, 500 (1978).

In the wake of *General Dynamics,* the Supreme Court and lower courts have found section 7 defendants to have successfully rebutted the government's prima facie case by presenting evidence on a variety of factors other than ease of entry. *See, e.g., Citizens & Southern,* 422 U.S. at 121–23, 95 S.Ct. at 2119–20 (no lessening of competition, and thus no violation of section 7, where acquired banks were already associated with acquiring bank; no discussion of ease of entry); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 276 (7th Cir. 1981) (acquired company's deteriorating market position both before and after acquisition rebutted prima facie case), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *FTC v. National Tea Co.,* 603 F.2d 694, 699–700 (8th Cir.1979) (weak market position of acquiring compa-

ny made substantial lessening of competition unlikely); *United States v. International Harvester Co.,* 564 F.2d 769, 773–79 (7th Cir.1977) (company successfully rebutted prima facie case by showing, among other things, financial weakness of acquired company, de facto independence of acquired company from acquiring company, strong level of competition in relevant market, and tendency of the market toward even stronger levels of competition).

Indeed, that a variety of factors other than ease of entry can rebut a prima facie case has become hornbook law. *See, e.g.,* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 919', 920.1, 921', 925', 934', 935', 939', at 813–23 (Supp.1989) (other factors include significance of market shares and concentration, likelihood of express collusion or tacit coordination, and prospect of efficiencies from merger); H. Hovenkamp, *Economics and Federal Antitrust Law* § 11.6, at 307–11 (1985) (other factors include supply of irreplaceable raw materials, excess capacity, degree of product homogeneity, marketing and sales methods, and absence of a trend toward concentration); L. Sullivan, *Handbook of the Law of Antitrust* § 204, at 622–25 (1977) (other factors include industry structure, weakness of data underlying prima facie case, elasticity of industry demand, inter-industry cross-elasticities of demand and supply, product differentiation, and efficiency). *See generally* Antitrust Section, ABA, *Horizontal Mergers: Law and Policy* 162–75, 201–04, 219–63 (Monograph No. 12, 1986).

It is not surprising, then, that the Department of Justice's own Merger Guidelines contain a detailed discussion of nonentry factors that can overcome a presumption of illegality established by market share statistics. *See* United States Dep't of Justice, Merger Guidelines (June 14, 1984) [hereinafter Guidelines], *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20,-561–64 (1988). According to the Guidelines, these factors include changing mar-

---

**6.** *See also id.* at 322 n. 38, 82 S.Ct. at 1522 n. 38 ("Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.").

ket conditions (§ 3.21), the financial condition of firms in the relevant market (§ 3.22), special factors affecting foreign firms (§ 3.23), the nature of the product and the terms of sale (§ 3.41), information about specific transactions and buyer market characteristics (§ 3.42), the conduct of firms in the market (§ 3.44), market performance (§ 3.45), and efficiencies (§ 3.5).

Given this acknowledged multiplicity of relevant factors, we are at a loss to understand on what basis the government has decided that "[t]o rebut the government's prima facie case, the defendants were *required* to show that *entry* would be both quick and effective in preventing supra-competitive prices." Brief for Appellants at 11–12 (emphasis added). If the district court in this case had focused exclusively on entry, it might be understandable that the government would mirror that focus in attacking the court's conclusion. The district court, however, canvassed a number of non-entry factors that contributed to its conclusion that the defendants had rebutted the prima facie case. By ignoring these factors, the government's arguments against that conclusion fall wide of the mark.

 The district court's analysis of this case is fully consonant with precedent and logic. The court reviewed the evidence proffered by the defendants as part of its overall assessment of future competitiveness in the United States HHUDR market. As noted above, the court gave particular weight to two non-entry factors: the flawed underpinnings of the government's prima facie case and the sophistication of HHUDR consumers. The court's consideration of these factors was not only appropriate, but imperative, because in this case these factors significantly affected the probability that the acquisition would have anticompetitive effects.

With respect to the first factor, the statistical basis of the prima facie case, the court accepted the defendants' argument that the government's statistics were mis-

leading. Because the United States HHUDR market is minuscule, market share statistics are "volatile and shifting," 731 F.Supp. at 11, and easily skewed. In 1986, for instance, only 22 HHUDRs were sold in the United States. In 1987, the number rose to 43, and in 1988 it fell to 38. Every HHUDR sold during this period, thus, increased the seller's market share by two to five percent. A contract to provide multiple HHUDRs could catapult a firm from last to first place. The district court found that, in this unusual market, "at any given point in time an individual seller's future competitive strength may not be accurately reflected." *Id.* at 9. While acknowledging that the HHUDR market would be highly concentrated after Tamrock acquired Secoma, the court found that such concentration in and of itself would not doom competition. High concentration has long been the norm in this market. For example, only four firms sold HHUDRs in the United States between 1986 and 1989. *Id.* at 5–6.[7] Nor is concentration surprising where, as here, a product is esoteric and its market small. Indeed, the trial judge found that "[c]oncentration has existed for some time [in the United States HHUDR market] but there is no proof of overpricing, excessive profit or any decline in quality, service or diminishing innovation." *Id.* at 12.

The second non-entry factor that the district court considered was the sophistication of HHUDR consumers. HHUDRs currently cost hundreds of thousands of dollars, and orders can exceed $1 million. *Id.* at 8. These products are hardly trinkets sold to small consumers who may possess imperfect information and limited bargaining power. HHUDR buyers closely examine available options and typically insist on receiving multiple, confidential bids for each order. *Id.* This sophistication, the court found, was likely to promote competition even in a highly concentrated market. *Id.* at 11.

---

**7.** *See also supra* note 3 (HHI of United States HHUDR market before merger was 2878; Department of Justice regards any market in which HHI exceeds 1800 as "highly concentrated").

The government has not provided us with any reason to suppose that these findings of fact are unsupported in the record or clearly erroneous, *see* Fed.R.Civ.P. 52(a). We thus accept them as correct. These findings provide considerable support for the district court's conclusion that the defendants successfully rebutted the government's prima facie case. Because the defendants also provided compelling evidence on ease of entry into this market, we need not decide whether these findings, without more, are sufficient to rebut the government's prima facie case. The foregoing analysis of non-entry factors is intended merely to underscore that, contrary to the government's assumption, these factors are relevant, and can even be dispositive, in a section 7 rebuttal analysis.

## II.

The existence and significance of barriers to entry are frequently, of course, crucial considerations in a rebuttal analysis. In the absence of significant barriers, a company probably cannot maintain supracompetitive pricing for any length of time. *See, e.g., United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33, 93 S.Ct. 1096, 1100–01, 35 L.Ed.2d 475 (1973); *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir.1990); *California v. American Stores Co.*, 872 F.2d 837, 842 (9th Cir.1989), *rev'd on other grounds*, — U.S. —, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1335–36 (7th Cir.1986). The district court in this case reviewed the prospects for future entry into the United States HHUDR market and concluded that, overall, entry was likely, particularly if Tamrock's acquisition of Secoma were to lead to supracompetitive pricing. The government attacks this conclusion, asserting that, as a matter of law, the court should have required the defendants to show clearly that entry would be "quick and effective." We reject this novel and unduly onerous standard. The district court's factual findings amply support its determination that future entry into the United States HHUDR market is likely. This determination, in turn, supports the

court's conclusion that the defendants successfully rebutted the government's prima facie case.

As authority for its "quick and effective" entry test, the government relies primarily on *United States v. Waste Management, Inc.*, 743 F.2d 976, 981–84 (2d Cir.1984). This reliance is misplaced. Neither *Waste Management* nor any other case purports to establish a categorical "quick and effective" entry requirement. The Second Circuit in *Waste Management* simply noted that the defendant had successfully rebutted the government's prima facie case by showing that entry into the Dallas/Fort Worth trash collection market was "easy." *Id.* at 983. That a defendant *may* successfully rebut a prima facie case by showing quick and effective entry does not mean that successful rebuttal *requires* such a showing. We are at a loss to understand how the government derived from *Waste Management* (where, lest the irony be missed, the government lost) the proposition that "a defendant arguing supposed ease of entry can rebut the government's prima facie case *only* by clearly showing that entry will be both quick and effective at preventing supracompetitive pricing." Brief for Appellant at 14 (emphasis added).

That the "quick and effective" standard lacks support in precedent is not surprising, for it would require of defendants a degree of clairvoyance alien to section 7, which, as noted above, deals with probabilities, not certainties. Although the government disclaims any attempt to impose upon defendants the burden of proving that entry actually will occur, *see* Reply Brief for Appellant at 13 n. 13, we believe that an inflexible "quick and effective" entry requirement would tend to impose precisely such a burden. A defendant cannot realistically be expected to prove that new competitors will "quickly" or "effectively" enter unless it produces evidence regarding specific competitors and their plans. Such evidence is rarely available; potential competitors have a strong interest in downplaying the likelihood that they will enter a given market. When the government sarcastically "wonders how slow and ineffec-

tive entry rebuts a prima facie case," *id.* at 12, it misses a crucial point. If the totality of a defendant's evidence suggests that entry will be slow and ineffective, then the district court is unlikely to find the prima facie case rebutted. This is a far cry, however, from insisting that the defendant must *invariably* show that new competitors will enter quickly and effectively.

Furthermore, the supposed "quick and effective" entry requirement overlooks the point that a firm that *never* enters a given market can nevertheless exert competitive pressure on that market. If barriers to entry are insignificant, the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs. *See Falstaff Brewing*, 410 U.S. at 532–33, 93 S.Ct. at 1100–01 (potential for defendant Falstaff to enter the market might induce brewers in the Northeast to maintain competitive prices); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 581, 87 S.Ct. 1224, 1231–32, 18 L.Ed.2d 303 (1967) ("It is clear that the existence of Procter at the edge of the industry exerted considerable influence on the market.... [The] industry was influenced by each firm's predictions of the market behavior of its competitors, actual *and potential.*") (emphasis added); *cf. Byars v. Bluff City News Co.*, 609 F.2d 843, 851 n. 19 (6th Cir.1979) ("If entry barriers are low, the threat of potential competition operates as a significant check on monopoly power since competitors will quickly enter the market if prices are raised significantly."). If a firm that *never* enters a market can keep that market competitive, a defendant seeking to rebut a prima facie case certainly need not show that any firm *will* enter the relevant market.

The final flaw in the proposed "quick and effective" standard is its manipulability. The adjectives "quick" and "effective" are not self-defining, and have not traditionally been used in the section 7 context. The government's Merger Guidelines do not use the words when discussing entry, noting only that

> [i]f entry into a market is so easy that existing competitors could not succeed in raising price for any significant period of

time, the Department is unlikely to challenge mergers in that market.... In assessing the ease of entry into a market, the Department will consider the likelihood and probable magnitude of entry in response to a "small but significant and nontransitory" increase in price.

Guidelines § 3.3, *reprinted in* 4 Trade Reg.Rep. (CCH) at 20,562. In its brief, moreover, the government fails to state its own standard consistently, insisting at one point that a defendant show that entry will be "sure, swift, and substantial." Brief for Appellant at 16. Our uncertainty over the meaning and implications of "quick and effective" entry makes us all the more resistant to the imposition of such a requirement. Nor has the government shown that current section 7 law is so confused as to warrant the invention of a new standard.

The government's insistence on a "quick and effective" entry standard only reaffirms our doubts, raised in section I of this opinion, about the government's approach to section 7 analysis. Predicting future competitive conditions in a given market, as the statute and precedents require, calls for a comprehensive inquiry. The government's standard would improperly narrow the section 7 inquiry, channelling what should be an overall analysis of competitiveness into a determination of whether a defendant has shown particular facts.

■ Having rejected the "quick and effective" entry standard itself, we turn briefly to the government's more general argument that the district court's findings regarding ease of entry failed to support its conclusion that the defendants had rebutted the prima facie case. The district court in this case discussed a number of considerations that led it to conclude that entry barriers to the United States HHUDR market were not high enough to impede future entry should Tamrock's acquisition of Secoma lead to supracompetitive pricing. First, the court noted that at least two companies, Cannon and Ingersoll–Rand, had entered the United States HHUDR market in 1989, and were poised

for future expansion.[8] 731 F.Supp. at 9, 10, 11. Second, the court stressed that a number of firms competing in Canada and other countries had not penetrated the United States market, but could be expected to do so if Tamrock's acquisition of Secoma led to higher prices. *Id.* at 10–11.[9] Because the market is small, "[i]t is inexpensive to develop a separate sales and service network in the United States." *Id.* at 8. Third, these firms would exert competitive pressure on the United States HHUDR market even if they never actually entered the market. *Id.* at 10–11. Finally, the court noted that there had been tremendous turnover in the United States HHUDR market in the 1980s. Secoma, for example, did not sell a single HHUDR in the United States in 1983 or 1984, but then lowered its price and improved its service, becoming market leader by 1989. *Id.* at 9, 10. Secoma's growth suggests that competitors not only can, but probably will, enter or expand if this acquisition leads to higher prices. The district court, to be sure, also found some facts suggesting difficulty of entry,[10] but these findings do not negate its ultimate finding to the contrary.

In sum, we see no error—legal or factual—in the district court's determination that entry into the United States HHUDR market would likely avert anticompetitive effects from Tamrock's acquisition of Secoma. The court's determination on entry, considered along with the findings discussed in section I of this opinion, suffices to rebut the government's prima facie case.

### III.

Finally, we consider the strength of the showing that a section 7 defendant must make to rebut a prima facie case. The district court simply reviewed the evidence that the defendants presented and concluded that the acquisition was not likely to substantially lessen competition. The government argues that the court erred by failing to require the defendants to make a "clear" showing. *See* Brief for Appellant at 13. The relevant precedents, however, suggest that this formulation overstates the defendants' burden. We conclude that a "clear" showing is unnecessary, and we are satisfied that the district court required the defendants to produce sufficient evidence.

The government's "clear showing" language is by no means unsupported in the case law. In the mid–1960s, the Supreme Court construed section 7 to prohibit virtually any horizontal merger or acquisition. At the time, the Court envisioned an ideal market as one composed of many small competitors, each enjoying only a small market share; the more closely a given market approximated this ideal, the more competitive it was presumed to be. *See United States v. Aluminum Co. of Am.,* 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964) ("It is the basic premise of [section 7] that competition will be most vital 'when there are many sellers, none of which has any significant market share.' ") (quoting *United States v. Philadelphia*

---

**8.** As the Guidelines note, " 'Entry' may occur as firms outside the market enter for the first time *or as fringe firms currently in the market greatly expand their current capacity.*" Guidelines § 3.3, *reprinted in* 4 Trade Reg.Rep. (CCH) at 20,562 n. 20 (emphasis added).

**9.** Some of these firms have already tried, but failed, to penetrate the United States HHUDR market. As the district court correctly noted, however, failed entry in the past does not necessarily imply failed entry in the future: if prices reach supracompetitive levels, a company that has failed to enter in the past could become competitive. *See* 731 F.Supp. at 11; *cf. Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 119 n. 15, 107 S.Ct. 484, 494 n. 15, 93 L.Ed.2d 427 (1986) ("In evaluating entry barriers ... a court should focus on whether significant entry barriers would exist *after* the merged firm had eliminated some of its rivals, because at that point the remaining firms would begin to charge supracompetitive prices, and the barriers that existed during competitive conditions might well prove insignificant.").

**10.** The court, for instance, noted that HHUDRs are custom-made, and thus are not readily interchangeable or replaceable. Buyers, therefore, tend to return to sellers from whom they have purchased in the past. 731 F.Supp. at 8. The court also found that HHUDR customers typically place great importance on assurances of product quality and reliable future service—considerations that may handicap new entrants. *Id.* It also noted the significant economies of scale involved in manufacturing HHUDRs. *Id.*

*Nat'l Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963)).

This perspective animated a series of decisions in which the Court stated that a section 7 defendant's market share measures its market power, that statistics alone establish a prima facie case, and that a defendant carries a heavy burden in seeking to rebut the presumption established by such a prima facie case. The Court most clearly articulated this approach in *Philadelphia Bank:*

> Th[e] intense congressional concern with the trend toward concentration [underlying section 7] warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence *clearly showing* that the merger is not likely to have such anticompetitive effects.

374 U.S. at 363, 83 S.Ct. at 1741 (emphasis added). *Philadelphia Bank* involved a proposed merger that would have created a bank commanding over 30% of a highly concentrated market. While acknowledging that the banks could in principle rebut the government's prima facie case, the Court found unpersuasive the banks' evidence challenging the alleged anticompetitive effect of the merger. *See id.* at 366–72, 83 S.Ct. at 1743–46.

In *United States v. Von's Grocery Co.,* 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Court further emphasized the weight of a defendant's burden. Despite evidence that a post-merger company had only a 7.5% share of the Los Angeles retail grocery market, the Court, citing anticompetitive "trends" in that market, ordered the merger undone. The Court summarily dismissed the defendants' contention that the post-merger market was highly competitive. *Id.* at 277–78, 86 S.Ct. at 1482.[11] Noting that the market was "marked at the same time by both a continuous decline in the number of small businesses and a large number of mergers," the *Von's Grocery* Court predicted that, if the merger were not undone, the market "would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed." *Id.* at 278, 86 S.Ct. at 1482; *see also United States v. Pabst Brewing Co.,* 384 U.S. 546, 550–52, 86 S.Ct. 1665, 1668–69, 16 L.Ed.2d 765 (1966) (acquisition producing brewer accounting for 4.49% of nationwide beer sales violates section 7; brewer's rebuttal evidence virtually ignored).

Although the Supreme Court has not overruled these section 7 precedents, it has cut them back sharply. In *General Dynamics,* 415 U.S. at 498–504, 94 S.Ct. at 1194–97, the Court affirmed a district court determination that, by presenting evidence that undermined the government's statistics, section 7 defendants had successfully rebutted a prima facie case. In so holding, the Court did not expressly reaffirm or disavow *Philadelphia Bank*'s statement that a company must "clearly" show that a transaction is not likely to have substantial anticompetitive effects. The Court simply held that the district court was justified, based on all the evidence, in finding that "no substantial lessening of competition occurred or was threatened by the acquisition." *General Dynamics,* 415 U.S. at 498, 94 S.Ct. at 1194.

*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s. Instead of accepting a firm's market share as virtually conclusive proof of its market power, the Court carefully analyzed defendants' rebuttal evidence.[12] These cases dis-

---

11. Justice Stewart, in dissent, emphasized the considerable amount of evidence in the record indicating the market's competitiveness. 384 U.S. at 290–301, 86 S.Ct. at 1489–95 (Stewart, J., dissenting).

12. Judge Posner has elucidated this point:

> The most important developments that cast doubt on the continued vitality of such cases as *Brown Shoe* and *Von's* are found in other cases, where the Supreme Court, echoed by

carded *Philadelphia Bank*'s insistence that a defendant "clearly" disprove anti-competitive effect, and instead described the rebuttal burden simply in terms of a "showing." *See, e.g., United States v. Marine Bancorporation,* 418 U.S. 602, 631, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974) (after government established prima facie case, "the burden was then upon appellees *to show* that the concentration ratios, which can be unreliable indicators of actual market behavior, did not accurately depict the economic characteristics of the [relevant] market") (citation omitted) (emphasis added); *United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975) (after government established prima facie case, "[i]t was ... incumbent upon [the defendant] *to show* that the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition") (emphasis added). Without overruling *Philadelphia Bank,* then, the Supreme Court has at the very least lightened the evidentiary burden on a section 7 defendant. *See generally* Note, 92 Harv.L.Rev. at 491 (describing impact of *General Dynamics* on section 7 jurisprudence).

▇ In the aftermath of *General Dynamics* and its progeny, a defendant seeking to rebut a presumption of anticompetitive effect must show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition. *See American Stores,* 872 F.2d at 842 (defendant can rebut prima facie case "through evidence *demonstrating* that statistics on market share, market concentration, and market concentration trends portray inaccurately the merger's probable effects on competition") (emphasis added); *cf. Waste Management,* 743 F.2d at 981 (defendant can rebut prima facie case "by a *demonstration* that the merger will not have anticompetitive ef-

fects") (emphasis added). The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully. A defendant can make the required showing by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor.

By focusing on the future, section 7 gives a court the uncertain task of assessing probabilities. In this setting, allocation of the burdens of proof assumes particular importance. By shifting the burden of producing evidence, present law allows both sides to make competing predictions about a transaction's effects. If the burden of production imposed on a defendant is unduly onerous, the distinction between that burden and the ultimate burden of persuasion—always an elusive distinction in practice—disintegrates completely. A defendant required to produce evidence "clearly" disproving future anticompetitive effects must essentially persuade the trier of fact on the ultimate issue in the case—whether a transaction is likely to lessen competition substantially. Absent express instructions to the contrary, we are loath to depart from settled principles and impose such a heavy burden. *See Kaiser Aluminum & Chem. Corp. v. FTC,* 652 F.2d 1324, 1340 & n. 12 (7th Cir.1981); *cf. Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (applying similar production-burden-shifting analysis to employment discrimination suits under title VII, and noting that "[t]he ultimate burden of persuading the trier of fact ... remains at all times with the plaintiff," *id.* at 253, 101 S.Ct. at 1093); 9 J. Wigmore, *Evidence* § 2489, at 300 (J. Chadbourn rev.ed. 1981) (burden of persuasion "never shifts" away from plaintiff).

the lower courts, has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws, not excluding the Clayton Act.... Applied to cases brought under Section 7, this principle requires the district court ... to make a judg-

ment whether the challenged acquisition is likely to hurt consumers, as by making it easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level. *Hospital Corp. of Am. v. FTC,* 807 F.2d 1381, 1386 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).

**992**

Imposing a heavy burden of production on a defendant would be particularly anomalous where, as here, it is easy to establish a prima facie case. The government, after all, can carry its initial burden of production simply by presenting market concentration statistics. To allow the government virtually to rest its case at that point, leaving the defendant to prove the core of the dispute, would grossly inflate the role of statistics in actions brought under section 7. The Herfindahl–Hirschman Index cannot guarantee litigation victories.[13] *Cf. Ball Memorial Hosp.*, 784 F.2d at 1336 (explaining that "[m]arket share is just a way of estimating market power, which is the ultimate consideration," and noting that "[w]hen there are better ways to estimate market power, the court should use them"). Requiring a "clear showing" in this setting would move far toward forcing a defendant to rebut a probability with a certainty.

\* \* \* \* \* \*

The appellees in this case presented the district court with considerable evidence regarding the United States HHUDR market. The court credited the evidence concerning the sophistication of HHUDR consumers and the insignificance of entry barriers, as well as the argument that the statistics underlying the government's prima facie case were misleading. This evidence amply justified the court's conclusion that the prima facie case inaccurately depicted the probable anticompetitive effect of Tamrock's acquisition of Secoma. Because the government did not produce sufficient evidence to overcome this successful rebuttal, the district court concluded that "it is not likely that the acquisition will substantially lessen competition in the United States either immediately or long-term." 731

F.Supp. at 12. The government has given us no reason to reverse that conclusion.

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

---

**13.** We refer the government to its own Merger Guidelines, which recognize that "[i]n a variety of situations, market share and market concentration data may either understate or overstate the likely future competitive significance of a firm or firms in the market." Guidelines § 3.2, *reprinted in* 4 Trade Reg.Rep. (CCH) at 20,561. Although the Guidelines disclaim "slavish[ ] adhere[nce]" to such data, *id.*, statement, *reprinted in* 4 Trade Reg.Rep. (CCH) at 20,552, we fear

that the Department of Justice has ignored its own admonition. The government does not maximize its scarce resources when it allows statistics alone to trigger its ponderous enforcement machinery. *Cf. Syufy Enters.*, 903 F.2d at 672 ("It is a tribute to the state of competition in America that the Antitrust Division of the Department of Justice has found no worthier target than this paper tiger on which to expend limited taxpayer resources.").