**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

**H.J. HEINZ, COMPANY,**
**et al., Defendants.**

**No. CIV.A. 00–1688 JR.**

United States District Court,
District of Columbia.

Oct. 19, 2000.

Richard B. Dagen, Paul J. Nolan, Gary H. Schorr, Thomas S. Respess III, Joseph Brownman, David A. Balto, James A. Fishkin, Federal Trade Commission, Washington, DC, Counsel for Plaintiff.

Edward R. Henneberry, Howrey & Simon, Washington, DC, Counsel for Defendant H.J. Heinz Company.

Mark Kovner, Gerald F. Masoudi, David R. Pruitt, Kirkland & Ellis, Washington, DC, Counsel for Defendant Milnot Holding Corporation.

David A. Bentley, Dewey Ballantine L.L.P., Washington, DC, Wayne A. Cross, Michael J. Gallagher, Michelle L. Wilhelm, Dewey Ballantine L.L.P., New York, NY, Counsel for Non Party Gerber.

## *OPINION*

ROBERTSON, District Judge.

The Federal Trade Commission seeks a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to enjoin the proposed merger of the baby food divisions of H.J. Heinz Company and Milnot Holding Corporation ("Beech–Nut"). The injunction is sought to preserve the status quo until full-scale administrative proceedings can determine whether the effect of the proposed merger "may be substantially to lessen competition" in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The matter was the subject of a five-day evidentiary hearing and has been fully briefed and argued. This Opinion sets forth the factual findings and conclusions of law that form the basis for an order, issued today, denying the Commission's motion.

## I. *BACKGROUND*

### A. *Market overview*

Four million infants in the United States consume 80 million cases of jarred baby food annually, representing a domestic market of $865 million to $1 billion. *See* DX 617–0002; DX 38; DX 1–0012; PX 336 at 565; DX 435 at 52. There are only three major manufacturers and distributors of jarred baby food in the United States: Heinz, Beech–Nut, and Gerber Products Company. *See* PX 782 at 1–2. Gerber is by far the largest domestic manufacturer. It enjoys, and has enjoyed for some 40 years, a dominant market share that has recently grown to between 65 and 70 percent. *See* PX 781; DX 617, App. B. The Gerber market share is now 65 percent, the Heinz share 17.4 percent, and the Beech–Nut share 15.4 percent. *See* DX 617, App. B.

Heinz manufactures and distributes a variety of food products worldwide, and, despite its relatively low domestic market share, is the largest producer of baby food

in the world. Heinz's domestic baby food products are manufactured at its Pittsburgh, Pennsylvania plant, which was recently updated at a cost of $120 million. The Pittsburgh plant now operates at 40 percent of its production capacity and produces 12 million cases of baby food annually.

Before its purchase by Milnot Holding Corporation from Ralcorp Holdings in September 1998, Beech–Nut had been owned by seven different companies. *See* DX 435 at 23.[1] Beech–Nut's annual sales of baby food are $138.7 million, of which 72 percent is jarred baby food. Beech–Nut manufactures all of its baby food in Canajoharie, New York, *see* Milnot Admis. ¶ 13, at a manufacturing plant that was built in 1907 and began manufacturing baby food in 1931. *See* Tr. 858. The plant is not technologically current. Beech–Nut submitted proof that it would be prohibitively expensive to make further improvements in the Canajoharie plant, *see* DX 159; DX 641 at 25; that management has realized all the cost-savings that can be achieved in Beech–Nut's production and distribution, *see* DX 641–0023; and that, although Beech–Nut is currently profitable, its business is stagnant or declining without any realistic prospect of change. The FTC has not disputed this evidence.

Heinz and Beech–Nut both maintain that, despite all their efforts, neither is able to build market share, either against one another or against Gerber. *See* Tr. 440; 442–43; 859. Gerber, on the other hand, does not aggressively pursue market share, because, given its already dominant position in the market, striving for any further gain in market share "becomes so

costly you get no return out of it." *See* DX 707–0001.

As the dominant firm in the market, Gerber is generally the first company to increase its price. Its prices have increased every year, above levels explainable by the rate of inflation.[2] Heinz has tended to follow Gerber's prices, but it markets its baby food as a "value brand," with a shelf price several cents below Gerber's. *See* PX 273 at 569; PX 415 at 153; DX 288–2109A, 0661A, 3380A. Gerber has expressed no desire to compete in the "value priced" sector of the market and has in fact conceded that market sector to Heinz. *See* DX 411; DX 412–0719. Beech–Nut strives to maintain price parity with Gerber, *see* Tr. 863, marketing its product as a premium brand, and has been able to maintain premium pricing without losing sales volume. *See* PX 3–4544. Gerber sometimes lowers prices against Beech–Nut, but only if and when Beech–Nut manifests sufficient strength in a particular market. *See* DX 411; DX 412–0719.

Gerber enjoys unparalleled brand recognition, and its brand loyalty is greater than that of any of product sold in the United States, including Coca–Cola and Nike. *See* DX 728–0001. Consumers generally view Heinz as being of slightly lower quality than Gerber. *See* PX 15; PX 429 at 341. Beech Nut's products are generally perceived as comparable in quality to Gerber's. *See* PX 97–0861 to 0862.

Nearly all supermarkets stock only two brands of baby food, not three. *See* DX 617 at ¶ 23. Gerber is invariably one of the two.[3] The food products industry

---

**1.** Milnot is jointly owned by its management and Madison Dearborn Capital Partners, LP, a private venture capital firm based in Chicago, Illinois. *See* Compl. ¶ 4, Milnot Ans. ¶ 1. For clarity, Milnot is referred to by the trade name "Beech–Nut" throughout this opinion.

**2.** Defendants' expert could not, however, rule out the possibility that Gerber's price increases are attributable to increased production costs. *See* Tr. 1026–27.

**3.** Ninety percent of all purchasers of baby food say that they make their purchases at grocery stores or supermarkets. *See* PX 98 at 530. *See id.* Twenty-seven percent say that they purchase baby food at discount superstores such as Wal–Mart or K–Mart. Gerber's market share figure is even higher when mass merchandiser sales are included. The percentage of mass merchandiser sales compared to grocery store sales is growing. *See* Tr. 986–987.

measures the extent of a particular product's presence in stores across the country by referring to a product's ACV (All Commodity Volume), which is stated as the percentage of stores that carry a certain product or product line. *See* Tr. 989, DX 1512. Gerber's ACV for jarred baby food approaches 100 percent, which means that Gerber is sold in virtually every food store in the United States. *See* DX 23–3630; Tr. at 989. Heinz has an ACV of approximately 40 percent, *see* DX 1–0069, and Beech–Nut, approximately 45 percent. *See* DX 444–2226. Heinz's sales are nationwide but are concentrated in northern New England, the Southeast and Deep South, and the Midwest. *See* Tr. 947, DX 15–0017. Beech–Nut's sales, also nationwide, are concentrated in the Atlantic region (New York and New Jersey), California, and Florida.

In general, witnesses described the baby food market as "boring," and "declining." *See* Tr. 441, 891–92; DX 38. During the last five years, grocery store sales have fallen more than 15 percent, despite the fact that the birth rate has remained stable. *See* DX 2–0016; DX 1–0012; DX 14–0008. This decline is partially attributable to a shift from jarred baby food to table food. *See* 1–0012. Beech–Nut's sales have either been flat or declining since the early 1990s, and it expects this trend to continue. *See* DX 1098; DX 463.

### B. *Procedural history*

On February 28, 2000, Heinz and Beech–Nut entered into a merger agreement. *See* DX 1314 at 16. Under the terms of the merger, Heinz would acquire 100 percent of Beech–Nut's voting securities for $185 million. On February 29, 2000, defendants filed a Premerger Notification and Report Form with the FTC and the Department of Justice, pursuant to the Hart–Scott–Rodino Antitrust Improvement Act of 1976, 15 U.S.C. § 18a. *See* DX 200–0001. On April 28, 2000, the FTC issued a Second Request for Information, which defendants complied with on June 8 and 9, 2000. *See* DX 460–0001; DX 299–0001. On July 7, 2000, the Commission

(by a 3–2 vote) authorized this action for a preliminary injunction under Section 13(b) of the FTCA, 15 U.S.C. § 53(b). *See* FTC Press Release, *FTC to Challenge Merger of Beech–Nut Nutrition Corp. and H.J. Heinz Co.* (visited Oct. 5, 2000) <http://www.ftc.gov/opa/2000/07/heinz.htm>. The FTC filed its complaint and motion for preliminary injunction on July 14, 2000. I conducted a five-day evidentiary hearing in late August and early September, and I heard final arguments on September 21, 2000.

## II. *ANALYSIS*

### A. *Legal standard*

■ Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits a merger between two companies "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition ... may be substantially to lessen competition, or to tend to create a monopoly." The Clayton Act authorizes the Commission to seek an injunction to prevent the consummation of any merger pending a full administrative hearing on its legality. *See* 15 U.S.C. § 53(b). The legality of a merger under Section 7 is a determination the Commission must make, and the Commission is not required in this preliminary injunction proceeding to demonstrate that the proposed merger would actually violate Section 7. *See FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1070 (D.D.C.1997).

■ Instead, the Commission is entitled to injunctive relief "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). "The Commission satisfies its burden to show likelihood of success if it 'raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance

and ultimately by the Court of Appeals.' " *Staples*, 970 F.Supp. at 1071 (quoting *FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir.1991)). The FTC must establish that there is a "reasonable probability" that the challenged transaction will substantially impair competition. *Id.* (citing cases).

 The Commission can satisfy its initial burden of establishing a prima facie case for enjoining the merger by demonstrating that the merger will result in a firm that controls an undue percentage share of the relevant market and increases the concentration of firms in the market. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Once the FTC has made that prima facie showing, the burden shifts to defendants to rebut the presumption of unlawfulness that arises. *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 613, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 54 (D.D.C. 1998). The defendant's burden is one of production: a "clear" showing that the merger is unlikely to lessen competition is unnecessary. *See Baker Hughes*, 908 F.2d at 991–92. The ultimate burden of persuasion rests with the Commission throughout.

### B. *Relevant market*

The first step in evaluating a merger is to define the relevant market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The relevant product market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. *See also Staples, Inc.*, 970 F.Supp. at 1074.

In this case, the parties agree that the relevant product market is jarred baby food. Jarred baby food can be replaced by homemade baby food and breast milk, but the Supreme Court's "interchangeability" test refers to *products*. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

"A geographic market is the geographic area 'to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition.' " *Staples*, 970 F.Supp. at 1073 (quoting *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994)). Both sides resort to regional or Standard Metropolitan Statistical Area data for purposes of analyzing competition in the jarred baby food business. The Commission, presumably with an eye to the Clayton Act's reference to "commerce in any section of the country," has preserved its position that the proposed merger's effects may be evaluated at the regional or SMSA level. Its advocacy of that position, however, has been perfunctory. The proposed merger is national in character. It would join two companies, each of which has only one domestic production facility for jarred baby food products. The parties agree that the geographic market is no broader than the United States.

I find that the relevant market is jarred baby food in the United States.

### C. *Market concentration*

 It is undisputed that the baby food industry is a highly concentrated market, and the FTC adduced evidence that the proposed merger will significantly increase market concentration. Gerber's 65 percent market share results in a Herfindahl–Hirschman index of 4225.[4] The expert testimony establishes that the total index

---

4. The Herfindahl–Hirschman Index ("HHI") is the sum of the squares of the market shares of all of the firms in a given market. It is an article of faith for the FTC, and it is recited in the FTC's Merger Guidelines, that any market with an HHI above 1800 is highly concentrated and that any merger in such a market that increases HHI by 100 or more points is presumptively anticompetitive.

score for the baby food industry is 4775. *See* DX 617, App. B. The proposed merger would increase the index to 5285, an increase of 510 points. This increase is five times the 100 point threshold established in the Merger Guidelines. There is no serious dispute, and I find, that the proposed merger would increase concentration in an already highly concentrated market. That showing and my finding establish a prima facie case under *Philadelphia Bank*.

## D. Barriers to market entry

"The existence and significance of barriers to entry are frequently ... crucial considerations in a rebuttal analysis [because] [i]n the absence of significant barriers, a company cannot maintain supracompetitive pricing for any length of time." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 987 (D.C.Cir.1990). There have been no significant entries into the baby food market in decades. *See* PX 188, at 286. The Commission contends that new market entrants are unlikely. The parties are in agreement that the cost of entry is significant making entry difficult and improbable. *See* DX 617 at ¶ 26, 28, 30; PX 782 at 12. Ease of entry is not available to these defendants to rebut the Commission's prima facie case.

## E. Nature and extent of competition between Heinz and Beech–Nut

■ The focus of the Commission's case is the competition between Heinz and Beech–Nut for the second position on the supermarket shelves, which its expert witness labeled "distribution competition." The other basic level of competition, labeled "consumer competition," *id.*, was addressed at length by the defendants but not emphasized by the Commission.

5. IRI ("Information Resources, Inc.") provides data concerning cash register transactions that are commonly used in the food industry for market analysis.

6. The FTC challenged Dr. Baker's econometrics survey by arguing that it failed to consid-

### 1. "Consumer competition"

It is undisputed that Heinz and Beech–Nut are virtually never found in the same supermarket; that Beech–Nut and Heinz do not price against the other or even consistently monitor one another's prices; and that the cross-elasticity of demand between Heinz and Beech–Nut is not statistically significant. *See* DX 130. Heinz and Beech–Nut asserted, and proved with econometric evidence, that they do not constrain one another's retail or consumer prices. Heinz and Beech–Nut maintain that they do not price against the other, *See* Tr. 626–28, 863. The FTC adduced no evidence of direct price competition between Heinz and Beech–Nut in the same region or SMSA.

Defendant's expert, Dr. Jonathan Baker, was director of the FTC's Bureau of Economics from 1995 until 1998. Dr. Baker studied the markets where all three companies had a significant presence, *see* Tr. 953, and markets where only Heinz or Beech–Nut had a significant presence with Gerber, seeking to isolate the effects of competition on price. Relying upon IRI data,[5] Dr. Baker analyzed shelf prices to determine the effects of Heinz's and Beech–Nut's prices on Gerber, and viceversa, and the effect of Heinz's prices on Beech–Nut's, and vice versa. His conclusion was that "consumer substitution between Heinz and Beech–Nut is very small and, therefore, the two firms are not constraining each other's pricing at the retail level very much." Tr. 955. He found no discernible differences in the price of baby food regardless of whether there were two or three competitors. "[B]ecause there is very little constraint on Heinz pricing from Beech–Nut," Dr. Baker stated, "this merger will not give Heinz any unilateral incentive to increase its price."[6] Tr. 969.

er the transaction price, i.e., the price after couponing, and relied instead on the shelf price. Dr. Baker convincingly responded by demonstrating that couponing occurs regardless of competition and that couponing does not greatly affect price over time.

### 2. *"Distribution competition"*

By far the bulk of the evidence submitted by both parties concerned the nature and extent of distribution competition—the competition between Heinz and Beech–Nut to be the second brand on the shelf. Trade spending is the clearest indicator of distribution competition. Trade spending is characterized as either "fixed" or "variable" and involves the payment of negotiated sums of money to retailers or retail chains. Fixed payments consist of "slotting fees," "pay-to-stay" arrangements, new store allowances, etc., *see, e.g.,* Tr. 901, 1133–35; PX 482 at 34–36, but are all essentially given in exchange for shelf space and desired product display. Variable payments, unlike fixed payments, are ostensibly tied to sales volume, *see* Tr. 970–71, and consist of "long term allowances" and merchandising funds. Long term allowances are payments to retailers, typically made upfront, that are intended to assure a specific sales volume and lower shelf price. *See* DX 85 at 47, Tr. 613. In theory, these allowances are refundable on a *pro rata* basis in the event that the retailer does not meet the desired volume. Merchandising funds, *see* Tr. 619, are offered to support temporary price reductions and sales, and include price discounts, retailer "loyalty card" discounts, or coupons. *See* Tr. 574.

The Commission attempted to show that trade spending competition between Heinz and Beech–Nut benefits consumers and that the merger will eliminate that benefit. With respect to fixed trade spending, the attempt failed completely. Fixed trade spending, according to testimony by Heinz's expert, which was corroborated by retailers' testimony, has no effect on the shelf price. *See* Tr. 160–62, 594, 864–65; PX 75; DX 81.

Variable trade spending does benefit consumers in theory, *see* Tr. 973–94, but the record provides no basis for quantifying that benefit. Moreover, the record leaves substantial doubt that the proposed merger would actually affect variable spending levels. All three companies use discounts, coupons and loyalty card programs to create price differentials. The merger will not change the need for such spending. Long-term allowances are paid in the bid competitions that have taken place between Heinz and Beech–Nut, but there is no evidence that any retailer has ever refunded money after failing to meet a sales target.

Dr. Baker's econometric analysis revealed that trade spending levels had no effect on price, even in markets where all three firms are present. *See* Tr. 588, 590, 591, 594–95, 863, 865, 867; DX 617–0015. Variable trade spending has fallen, and fixed trade spending has risen, in response to retailer consolidation, which has allowed retailers greater bargaining power in negotiating contracts with manufacturers. *See* DX 617–0024. Increases in trade spending during bid competition for these contracts consisted almost entirely of increases in fixed spending. *See* DX 617–0023.

The evidence to support the FTC's assertion that the proposed merger will affect variable trade spending levels and consumer prices is thus, at best, inconclusive. The FTC did submit examples of short-term couponing initiatives that resulted in lower prices, but absent a stronger connection between these couponing initiatives and competition between Heinz and Beech–Nut for shelf space, it is impossible to conclude with any certainty that the consumer benefit from such couponing initiatives would be lost in the merger.

### 3. *Innovation and product differentiation*

The FTC did not assert or prove that there has been any significant competition between Heinz and Beech–Nut in terms of innovation or product differentiation. Indeed, the evidence is that, as the market is now configured, neither Heinz nor Beech–Nut is strong enough to compete successfully in these areas.

When Heinz attempted to market a premium all-organic product known as "Earth's Best," Gerber immediately

launched its "Tender Harvest" line and offered special incentives to retailers if they agreed to discontinue the Heinz product. *See* DX 14–0049. The launch of Earth's Best failed, and Heinz sold the product line at a $10 million loss. *See* Tr. 449. When Beech–Nut ran advertisements illustrating differences between its products and Gerber's in terms of their nutritional value, Gerber retaliated by lowering prices and increasing consumer promotion spending in Beech–Nut areas, driving Beech–Nut's volume down dramatically. *See* DX 411–0199. Beech–Nut officials testified that this experience taught them to adopt a less competitive posture to avoid losing market share again.

### F. *Likely post-merger competition*

■ The central contention of the defendants is that the merger is the only way to challenge Gerber's dominant market share. Defendants argue that their merged baby food business will be much more efficient, and that the efficiencies will be used to compete with Gerber. They argue that, with the best of the two brands' recipes, Heinz's value pricing strategy, and Beech–Nut's brand equity, they will have a more attractive and attractively priced product. And, they argue, their combined shelf space will give the merged business—at last—an ACV high enough to enable serious efforts to innovate.

This is a variant on the "against giants" defense first suggested by the Supreme Court in *Brown Shoe:* "[w]hen concern as to the Act's breadth was expressed, supporters of the amendments indicated that it would not impede, for example, a merger between two small companies to enable the combination to compete more effectively with larger competitors dominating the relevant market." 370 U.S. at 319, 82 S.Ct. 1502. *See generally* Julian O. von Kalinowski et al., *Antitrust Law and Trade Regulation,* § 30.04[5] (2d ed.1999).

Following structural antitrust doctrine, however, the Commission predicts that a merged Heinz/Beech–Nut will not actually engage Gerber in very much competition; that, sooner or later, the merged entity will lapse into following Gerber's price increases and taking profits; and that, in the absence of a third competitor, the merged entity will find it easier to engage in coordinated interaction and collusive activity, *see* Tr. 197–198. The same antitrust doctrine, as well as case law, counsels that I discount or disregard the aspirational testimony of Heinz's chief executive officer, who stated that this merger was not intended to eliminate a competitor but is part of a larger plan to challenge Gerber at the national level, *see* Tr. 452–53, 463; invoking his proven record of stirring up stagnant companies and building market share, *see* Tr. 458, 463–64, 509; and referring to the demands of Wall Street that companies not rest on their laurels but demonstrate continuing growth, *see* Tr. 453.

My conclusion in this case does not rest upon aspirational testimony, but instead credits powerful evidence in the record about the efficiencies realized by the merger, and about the enhanced prospects of the merged entity to introduce innovative products to compete with Gerber. That evidence, in my view, shows that the Commission's prima facie case inaccurately predicts the merger's probable effect as future competition. *See Baker Hughes,* 908 F.2d at 990.[7]

#### 1. *Efficiencies*

Noting that "some lower courts . . . have begun to consider efficiencies claims in mergers," FTC Staff Report, *Anticipating the 21st Century: Competition Policy in the New High–Tech, Global Marketplace,* Ch. 2 at 27 (May 1996), the Commission amended its Merger Guidelines in 1997 to provide that "efficiencies are properly considered in merger analysis," *id.* at 1; *see*

---

**7.** The Commission's argument that further concentration in the baby food industry will increase the likelihood of collusion was effectively rebutted by Dr. Baker's testimony regarding the structural market barriers to collusion in the market. *See* Tr. 1010–1023.

*also Baker Hughes,* 908 F.2d at 985, if they are merger-specific and cognizable—i.e., verified and not the result of anticompetitive reductions in output and services.

Heinz calculates that it will achieve merger-specific savings of between $9.4 million and $12 million. *See* Tr. 759. Production of baby food products will be consolidated at the more advanced Pittsburgh plant, which can handle the combined volume of Heinz and Beech–Nut sales and still have 20 percent capacity available for future growth. *See* Tr. 684. Consolidation of production in the automated Pittsburgh plant will achieve substantial cost savings in salaries and operating costs. (At the Canajoharie plant it takes 320 workers to produce 10 million cases of baby food, while 150 workers produce 12 million cases at Pittsburgh.) Substantial savings would also be realized in the cost of converting raw materials, reducing waste, and consolidating administrative overhead. Defendants adduced the testimony of David Painter, who evaluated mergers at the Commission for many years. He found the variable manufacturing cost savings that will be achieved in the merger "substantial, significant ... among the largest that I have ever seen certainly in a manufacturing segment." Tr. 750; DX 629 at ¶ 82. Consolidation of production in the Pittsburgh plant, he found, would reduce the cost of processing the volume of baby food now produced by Beech–Nut by some 43 percent, a savings he found "extraordinary." Tr. 759–760.

Heinz also argues that its distribution network is much more efficient than Beech–Nut's current system. By taking advantage of Heinz's six regional distribution centers, Heinz argues that it can cut substantial costs that result from Beech–Nut's current distribution network, which includes only two distribution sites.

These are the kinds of efficiencies recognized by the Commission's *Horizontal Merger Guidelines* ¶ 4: "efficiencies resulting from shifting production among facilities formerly owned separately, which enable the merging firms to reduce the marginal cost of production...." They will "enabl[e] the combined firm to achieve lower costs in producing a given quantity and quality than either firm could have achieved without the proposed transaction." *Id.* In the context of this particular case, those efficiencies will enable Heinz to provide the best of the two companies' recipes under the new Heinz/Beech–Nut (or Beech–Nut/Heinz) label, and to apply its value pricing strategy to the entire combined production volume. The Commission does not seriously dispute the proposition that the merger will result in better recipes for former Heinz buyers and value pricing for former Beech–Nut buyers. Those consumer benefits will be immediate and virtually automatic, and to recognize them does not require accepting at face value the aspirational testimony of Heinz executives. Whether Heinz will use the considerable cost savings from the merger to mount a vigorous campaign against Gerber for shelf space and market share remains to be seen. When the efficiencies of the merger are combined with the new platform for product innovation, however, it appears more likely than not that Gerber's own predictions of more intense competition, *see* DX 701 at 199; DX 717 at 147; DX 703 at 183, will come true.

### 2. *Innovation*

The conditions for increased competition in the form of product innovation and product differentiation will be enhanced by the merger, because the distribution of the combined entities will add Heinz's ACV to Beech–Nut's ACV. Current Heinz policy disfavors attempts to launch new products in the absence of substantial nationwide distribution, *see* Tr. 442, 446.[8] The testimony of defendants' expert Professor Bak-

---

**8.** The failure of Heinz's attempt to launch its Earth's Best brand, *supra,* may or may not have been foreordained by Heinz's low ACV. The testimony of Heinz witnesses was that Gerber responded immediately to Earth's Best with its own new label, and that Gerber, with its ACV of nearly 100, was able to overwhelm Heinz's launch effort. *See* Tr. 446.

er explains and justifies that policy. He testified that new product launches are only practical when a firm's ACV is high enough—his threshold is 70 percent—to ensure higher levels of distribution, so that marketing is cost effective, *see* Tr. 990.

The merged entity will have an ACV of about 90 percent (some 10 percent of food stores carry only Gerber). That ACV will be high enough to support introduction of the Heinz Environmental "Oasis" program that is already in place in Europe, as well as a planned aseptic baby food product. As Heinz describes its Oasis program, it is an effort to convince mothers that Heinz baby food is "more nutritious and safe than anything that they can do themselves." PX 695.

The FTC asserts that Heinz has overestimated the probable success of the Oasis program, challenges Professor Baker's use of an ACV threshold of 70 percent as too high, and argues that there are no barriers to Heinz's innovation because it has the ability to spread development costs for new products over its broader world markets, thereby making development more cost effective. Those assertions, however, are mainly lawyers' arguments. Their record support in Dr. Hilke's conclusory testimony I found unconvincing.

 &#42; &#42; &#42; &#42; &#42; &#42;

[T]he economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws . . . . [T]his principle requires the district court . . . to make a judgment whether the challenged acquisition is likely to hurt consumers, as by mak-

ing it easier for the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level.

*Hospital Corp. of Am. v. FTC,* 807 F.2d 1381, 1386 (7th Cir.1986) (Posner, J.). The Commission made its prima facie case by showing increased market concentration. The defendants rebutted that case with proof that the proposed merger will in fact increase competition. The Commission responded to the rebuttal case essentially with only structural theory.

"Section 7 involves *probabilities,* not certainties or possibilities. The Supreme Court has adopted a totality of the circumstances approach to the statute, weighing a variety of factors to determine the effects of a particular transaction on competition." *Baker Hughes,* 908 F.2d at 984. I find it more probable than not that consummation of the Heinz/Beech–Nut merger will actually increase competition in jarred baby food in the United States.

### G. *Equities*

Weighing the equities in a merger case requires considering "the potential benefits, public and private, that may be lost by merger blocking injunction, whether or not those benefits could be asserted defensively in a proceeding for permanent relief." *FTC v. Weyerhaeuser Co.,* 665 F.2d 1072, 1084 (D.C.Cir.1981). The public equities involved in this case are quite straightforward.[9] On the one hand, if the merger is allowed to proceed before the full-scale administrative proceedings contemplated by the Federal Trade Commission Act can be had, the outcome of such proceedings

---

9. The parties have not stressed private equities, but I have nevertheless considered them. The private equities here—the corporate interests of Heinz and Milnot and especially the interests of Dearborn Capital Partners LP, which presumably acquired Milnot through a leveraged buyout with the purpose and intent of selling its interest at a profit—are undoubtedly important to the private parties, but they do not affect the outcome of this matter.

Beech–Nut asks me to recognize, perhaps as an equity matter, a variant of the "failing firm defense." *See Dr Pepper/Seven–Up Cos.*

*v. FTC,* 991 F.2d 859, 864–65 (D.C.Cir.1993). The argument is that the static state of the baby food market will make Beech–Nut's outmoded means of production less and less profitable, eventually rendering Beech–Nut uncompetitive and reducing the market to two firms. I have given no weight to this argument. Beech–Nut may have indeed realized its maximum profit potential, and it may be unable to boost production or distribution. At present, however, it is a profitable and ongoing enterprise.

will not matter, because the Canajoharie plant will be closed, the Beech–Nut distribution channels will be closed, the new label and recipes will be in place, and it will be impossible as a practical matter to undo the transaction. On the other hand, if the Commission's motion for preliminary injunction is granted, the defendants' right of appeal under 28 U.S.C. § 1292(a)(1) will not matter: "[I]t is well recognized that the issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy. This is particularly true in the acquisition and merger context, because, as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger will in all likelihood prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir.1980).

It is undisputed that a preliminary injunction would kill this merger. Appellate review of my decision in this case is thus, as a practical matter, available only if the motion for preliminary injunction is denied. While this observation does not affect the overall resolution of the instant motion, it is a factor that tips the balance of the equities slightly in favor of denying the motion.

### III. CONCLUSION

Although the Commission did establish a prima facie case supporting a preliminary injunction, it did not effectively respond to the defendants' rebuttal evidence, and it ultimately failed to sustain its burden of persuasion for the proposition that it is likely to succeed on the merits. Having considered the Commission's likelihood of ultimate success, and having weighed the equities, I conclude that it would not be in the public interest to grant the Commission's motion for preliminary injunction. An appropriate order accompanies this Opinion.