KAVANAUGH, Circuit Judge,
dissenting:
This important antitrust case involves a multi-billion dollar merger between two health insurers, Anthem and Cigna. As relevant to this case, those two insurers sell insurance services to large national businesses. There are four national insurers in that market: Anthem, Cigna, United, *372 and Aetna. Anthem and United are the two major insurers in this market, whereas Cigna is a fairly small player. In the 14 States where Anthem and Cigna sell insurance services to large national businesses, Anthem has a 41% share of the market, and Cigna has a 6% share.
The U.S. Government sued under Section 7 of the Clayton Act to block the Anthem-Cigna merger. See 15 U.S.C. §§ 18, 25. The Government alleged that the merger would unlawfully lessen competition in the market for insurance services sold to large national businesses. The District Court agreed with the Government and enjoined the merger. The majority opinion affirms. I respectfully dissent.
At the outset, it is important to stress that this is an unusual horizontal merger case because of the nature of this particular slice of the insurance industry. To properly analyze this case, it is essential to understand precisely how these markets work.
There are three main players: (i) large employers, (ii) insurers, and (iii) healthcare providers, namely hospitals and doctors. Under the standard contracts that apply in this particular segment of the insurance industry, the employers do not pay premiums to the insurers. And the insurers do not pay the hospitals and doctors for healthcare services provided to the employers’ employees. Instead, the employers pay insurers a fee for obtaining access to the insurers’ provider network. Insurers in turn contract with healthcare providers' — • hospitals and doctors — to develop that provider network. In that upstream market, the insurers negotiate rates in advance with the hospitals and doctors.
As a result, when the employers’ employees need health care, the employers pay those negotiated rates to the healthcare providers. Importantly, therefore, employers in this market are self-insured. They pay the insurers a fee simply to obtain access to the provider networks arranged by the insurers, as well as for certain administrative services performed by the insurers.
To summarize in simple terms: The employers pay the insurers a fee, and the insurers then act as the employers’ purchasing agents for healthcare services. In that upstream market, the insurers negotiate in advance with hospitals and doctors over the rates that will be charged to employers for their employees’ health care. When insurers negotiate lower provider rates, employers save money on health care.
Here, two insurers (Anthem and Cigna) want to merge. The majority opinion sees this as a classic horizontal merger case where the high concentration of this market and the merged insurer’s high market share would mean increased prices for the employer-customers. But that understanding misses what I believe is the critical feature of this case. Here, these insurance companies act as purchasing agents on behalf of their employer-customers in the upstream market where the insurers negotiate provider rates for the employer-customers. When the insurers negotiate lower provider rates, those savings go directly to the employer-customers. The merged Anthem-Cigna would be a more powerful purchasing agent than Anthem and Cigna operating independently. The merged Anthem-Cigna would therefore be able to negotiate lower provider rates on behalf of its employer-customers. Those lower provider rates would mean cost savings that would be passed through directly to the employer-customers. To be sure, the merged company may charge its employer-customers an increased fee for obtaining those savings. But the record overwhelmingly demonstrates that the cost *373 savings to employers would far exceed any increased fees paid by employers.
In short, the record decisively demonstrates that this merger would be beneficial to the employer-customers who obtain insurance services from Anthem and Cigna. That is the core of my respectful disagreement with the majority opinion. (As I will explain in Part I-C below, if there is a problem with this merger, the problem lies in the merger’s effects on hospitals and doctors in the upstream market, not in the merger’s effects on employers in the downstream market.)
In Part I of this dissent, I will outline my approach to this case. In Part II, I will briefly summarize some of my concerns about the majority opinion and the concurrence.
I
A
The Government contends that this merger between Anthem and Cigna would cause undue market concentration in the market for the sale of insurance services to large employers, and would increase the merged company’s market share to an anti-competitive level. The Government argues that, as a result, the merged Anthem-Cigna would be able to use its market power to raise the fees it charges to large employers for those insurance services. How much? The evidence in the record suggests that large employers would pay Anthem-Cigna increased fees of about $48 million annually by one estimate, up to $220 million annually by another estimate, and up to $930 million annually by yet another estimate.
But that is not the end of the antitrust analysis under the law governing horizontal mergers. The case law of the Supreme Court and this Court, as well as the Government’s own Merger Guidelines, establish that we must consider the efficiencies and consumer benefits of a merger together with its anti-competitive effects. See United States v. General Dynamics Corp., 415 U.S. 486, 498-500, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); FTC v. H.J. Heinz Co., 246 F.3d 708, 720 (D.C. Cir. 2001); United States v. Baker Hughes Inc., 908 F.2d 981, 990-91 (D.C. Cir. 1990); U.S. Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 10, at 29-31 (2010).
Here, as I will explain, the analysis of the overall effects of this merger shows that the merger would not substantially lessen competition in the market for the sale of insurance services to large employers. The record demonstrates that those large employers would save an amount ranging from $1.7 to $3.3 billion annually due to reduced rates charged by healthcare providers. For large employers, therefore, the savings from the merger would far exceed the increased fees they would pay to Anthem-Cigna as a result of the merger.
To begin with, the record evidence overwhelmingly demonstrates that the merged Anthem-Cigna, with its additional market strength and negotiating power in the upstream market, would be able to negotiate lower provider rates from hospitals and doctors for healthcare services. Indeed, the Government itself agrees that this merger would allow Anthem-Cigna to obtain lower provider rates. Linger on that point for a moment: The Government concedes that Anthem-Cigna would be able to negotiate lower provider rates that employers would pay for their employees’ health care. On top of that, in light of the “affiliate clause” in many of Anthem’s existing contracts, the merger would allow at least some of the businesses that currently purchase insurance services from Cigna to obtain low *374 er rates that Anthem has previously negotiated with providers.
How much would provider rates be reduced? Anthem-Cigna’s integration planning team, working in consultation with McKinsey, an independent consulting firm, calculated $2.6 to $8.8 billion in projected annual savings for Anthem-Cigna’s employer-customers as a result of the merger. Anthem-Cigna’s expert, Dr. Israel, worked independently of the integration team, but he came to a similar conclusion. He determined that the merger would yield $2.4 billion in annual medical cost savings.
The record evidence also overwhelmingly demonstrates that the medical cost savings from the lower provider rates negotiated by Anthem-Cigna would be largely if not entirely passed through to the large employers that contract with Anthem-Cigna. The savings are passed through to employers because, under the contractual arrangements that apply in that market, the employers pay healthcare providers for the healthcare services provided to employees. So if the price of healthcare services is lower, the employers would directly benefit because the employers would then pay those lower prices.
The Government critiques those estimates in part by noting that the estimates include cost savings that will accrue to the fully insured employers. It is true that a slice of this large employer market is fully insured, not self-insured. For those large employers, there would not necessarily be automatic pass-through. Even taking the fully insured employers out of the equation, however, the annual savings to self-insured employers would still be at least $1.7 billion annually.
By contrast, the Government’s expert, Dr. Dranove, never did a merger simulation that calculated the amount of the savings that would result from the lower provider rates and be passed through to employers. Even though the Government admitted that -the merger would lead to a reduction in provider reimbursement rates, Dr. Dranove built an assumption into all of his models that there would be zero medical cost savings. See Trial Tr. 1159, 1867. So we are left with Anthem-Cigna’s evidence showing $1.7 to $3.3 billion annually in passed-through savings for employers.[1]
Under the law, those efficiencies and consumer benefits identified by Anthem-Cigna must be both merger-specific and verified. See U.S. Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 10, at 30. Both requirements are satisfied here.
The efficiencies and consumer benefits in this case are merger-specific by definition. As even the Government admits, Anthem-Cigna’s enhanced bargaining power would come from the merger. And that *375 enhanced bargaining power is a large part of what would enable Anthem-Cigna to negotiate the lower provider rates that in turn would lead to cost savings for employers. So, too, Anthem’s ability to rely on its existing contracts to offer lower rates to Cigna customers is a direct result of the merger. There is little if any evidence to support the made-up notion that Anthem and Cigna could obtain lower provider rates even absent the merger. The claimed savings are merger-specific.
Moreover, the efficiencies and benefits were sufficiently verified (i) by Anthem-Cigna’s expert witness Dr. Israel, (ii) by the .merger integration planning team, working with McKinsey, the independent consulting firm, and (iii) by various healthcare providers who testified at trial. To be verified, the efficiencies and consumer benefits must be “more than mere speculation and promises about post-merger behavior.” Heinz, 246 F.3d at 721. But they need not be certain. They merely must be probable. See Baker Hughes, 908 F.2d at 984 (“Section 7 involves probabilities, not certainties or possibilities.”). Here, that bar is cleared because there is no doubt that the merger would reduce provider rates (as the Government concedes) and no doubt that the savings from those lower provider rates would be largely passed through to employers (as the contracts and basic structure of this self-insured market require). To be sure, one can debate just how much the employers would benefit from this merger. But Anthem-Cigna’s expert and integration planning team, calculated savings of $1.7 to $3.3 billion annually. On this record, there is little basis to doubt that the cost savings for employers as a result of the merger would be large — and far larger than the increased fees charged by insurers to employers as a result of the merger.
In short, the record overwhelmingly establishes that the merger would generate significant medical cost savings for employers in all of the geographic markets at issue here — overall, approximately $1.7 to $3.3 billion annually — and employers would therefore spend significantly less on healthcare costs. (As noted, the increased fees for employers, on the other hand, would amount to $48 to $930 million.) And because the employers would spend less on health care for employees, they would have more to spend on employees’ salaries, thereby benefitting their employees. Some of the ultimate beneficiaries of this merger would be the rank-and-file workers who are employed by the businesses that obtain insurance services from Anthem and Cig-na.
I of course recognize that the District Court’s factual findings are reviewed only for clear error. But we are not a rubber stamp. And here, the record convincingly demonstrates that this merger would significantly reduce healthcare costs for the large employers that purchase insurance services from Anthem and Cigna. That is true across the 14 states in which Anthem and Cigna both operate, including Virginia (and the Richmond market). The District Court clearly erred, therefore, in concluding that the merger would substantially lessen competition in the market in which insurance services are sold to large employers.
B
In a separate discussion, however, the District Court also relied on 1960s Supreme Court cases and suggested that antitrust law may not allow consideration of the efficiencies and consumer benefits in the first place. If that were true, this would be an easy case for the Government given the concentration of the market and the market share of the merged company. *376 But that description of the law is not correct.
In landmark decisions in the 1970s— including United States v. General Dynamics Corp., 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), and Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) — the Supreme Court indicated that modern antitrust analysis focuses on the effects on the consumers of the product or service, not the effects on competitors. In the horizontal merger context, the Supreme Court in the 1970s therefore shifted away from the strict anti-merger approach that the Court had employed in the 1960s in cases such as Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).
As this Court has previously noted, in “the mid-1960s, the Supreme Court construed section 7 to prohibit virtually any horizontal merger or acquisition,” but the Supreme Court subsequently “cut” those precedents “back sharply,” beginning with its 1974 decision in General Dynamics. Baker Hughes, 908 F.2d at 989-90. In General Dynamics, the Supreme Court made clear that the merger analysis must take account not just of market concentration and market shares, but also of the “structure, history and probable future” of" the market. 415 U.S. at 498, 94 S.Ct. 1186 (quoting Brown Shoe, 370 U.S. at 322 n.38, 82 S.Ct. 1502); see also E. Thomas Sullivan & Jeffrey L. Harrison, Understating Antitrust and Its Economic Implications 369 (6th ed. 2014) (“General Dynamics signaled a major shift in § 7 interpretation.”); Note, Horizontal Mergers After United States v. General Dynamics Corp., 92 Harv. L. Rev. 491, 499, 502 (1978) (The General Dynamics case “signaled a new judicial approach to section 7 cases.... By endorsing an inquiry into such factors — the structure, history and probable future of the relevant market — General Dynamics brought antitrust analysis back into line with current economic thought”) (internal quotation marks omitted); cf. Robert H. Bork, The Antitrust Paradox 210 (1978) (“It would be overhasty to say that the Brown Shoe opinion is the worst antitrust essay ever written.... Still, all things considered, Broum, Shoe has considerable claim to the title.”).
Applying that broader analysis, the General Dynamics Court rejected the Government’s assertion in that case that a proposed merger. between two leading coal producers would violate Section 7 of the Clayton Act. In subsequent cases, the Supreme Court has adhered to General Dynamics. See, e.g., United States v. Marine Bancorporation, Inc., 418 U.S. 602, 631, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); United States v. Citizens & Southern National Bank, 422 U.S. 86, 120, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). Notably, since 1975, the Supreme Court has not decided a case assessing the lawfulness of a horizontal merger under Section 7 of the Clayton Act. So General Dynamics remains the last relevant word from the Supreme Court.
This Court has already concluded that we are bound by General Dynamics, not by the earlier 1960s Supreme Court cases. In Baker Hughes, we explained that “General Dynamics began a line of decisions differing markedly in emphasis from the Court’s antitrust cases of the 1960s. Instead of accepting a firm’s market share as virtually conclusive proof of its market power, the Court carefully analyzed defendants’ rebuttal evidence.” Baker Hughes, 908 F.2d at 990.[2] In Baker Hughes, we *377 thus cited General Dynamics for the proposition that the Section 7 analysis is “comprehensive” and focuses on a “variety of factors,” including “efficiencies.” Id. at 984, 986. As Baker Hughes recognized, and as this Court reaffirmed in its later decision in Heinz, modern merger analysis must consider the efficiencies and consumer benefits of the merger. See Baker Hughes, 908 F.2d at 984-86; Heinz, 246 F.3d at 720 (“[E]fficiencies can enhance the merged firm’s ability and incentive to compete, which may result in lower prices, improved quality, or new products.”) (internal quotation marks omitted). Importantly, even the Government’s own Merger Guidelines now recognize that the merger analysis must consider the efficiencies and consumer benefits of the merger. See U.S. Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 10, at 29-31; see also Baker Hughes, 908 F.2d at 985-86 (“It is not surprising” that “the Department of Justice’s own Merger Guidelines contain a detailed discussion of non-entry factors that can overcome a presumption of illegality established by market share statistics.” Those “factors include ... efficiencies.”).
We are bound by the modern approach taken by the Supreme Court and by this Court. See generally Bryan A. Garner et al., The Law of Judicial Precedent 31 (2016) (“[W]hen the Supreme Court overturns the standard that it had previously used to resolve a particular class of cases,” federal courts “must apply the new standard and reach the result dictated under that new standard.” The “results reached under the old standard” are no longer “binding precedent.”). Under the modern approach reflected in cases such as General Dynamics, Baker Hughes, and Heinz, the fact that a merger such as this one would produce heightened market concentration and increased market shares (and thereby potentially harm other insurers that are competitors of Anthem and Cigna) is not the end of the legal analysis. Under current antitrust law, we must take account of the efficiencies and consumer benefits that would result from this merger. Any suggestion to the contrary is not the law.
C
That said, on my view of the case, the Government could still ultimately block this merger based on the merger’s effects on hospitals and doctors in the upstream provider market. At trial, the Government asserted an alternative ground for blocking the merger: The Government claimed that the merger between Anthem and Cig-na would give Anthem-Cigna monopsony power in the upstream market where Anthem-Cigna negotiates provider rates with hospitals and doctors. The District Court did not decide that separate claim. I would remand for the District Court to decide it in the first instance.
Monopsony power describes a scenario in which Anthem-Cigna would be able to wield its enhanced negotiating power to unlawfully push healthcare providers to accept rates that are below competitive levels. That may be an antitrust problem in and of itself. Moreover, the exercise of monopsony power to temporarily reduce consumer prices does not qualify as an efficiency that can justify an otherwise anti-competitive merger. The consumer welfare implications (and consequently, the antitrust law implications) of monopsony power and ordinary bargaining power are very different. Although both monopsony and bargaining power result in lower input prices, ordinary bargaining power usually results in lower prices for consumers, *378 whereas monopsony power usually does not, at least over the long term. See 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 980, at 108 (3d ed. 2009); Herbert Hovenkamp, Federal Antitrust Policy § 1.2b, at 15 (4th ed. 2011). Therefore, the exercise of bargaining power by Anthem-Cigna is procompetitive because it usually results in lower prices for Anthem-Cigna’s employer-customers. By contrast, the exercise of monopsony power by Anthem-Cigna may be anticompetitive because it may result in higher prices for Anthem-Cigna’s employer-customers. Cf. U.S. Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 10, at 30 (“Cognizable efficiencies ... do not arise from anticompeti-tive reductions in output or service.”).
Notably, even Anthem-Cigna concedes that the merger would be unlawful if the merger would give Anthem-Cigna monop-sony power in the upstream market. See Tr. of Oral Arg. at 85 (Defense Counsel: “If it was an exercise of market power on the buy-side, monopsony, we are not claiming that it’s a cognizable efficiency. We’re accepting the rule in the merger guidelines that if it really is the exercise of market power, which means a constraint in output, bringing the price away from the competitive level, yes, we’re not claiming that that’s a cognizable efficiency.”).
To be clear, if Anthem-Cigna would obtain lower provider rates merely because of its enhanced ability to negotiate lower prices with providers, that alone would not necessarily be an antitrust problem. But if Anthem-Cigna would obtain provider rates that are below competitive levels because of its exercise of unlawful monopsony power against providers, that could be a problem, and perhaps a fatal one for this merger. In other words, if the lower provider rates from this merger turn but to be the fruit of a poisonous tree — namely, the fruit of Anthem-Cigna’s exercise of unlawful monopsony power against hospitals and doctors in the upstream market — then the merger may be unlawful. See U.S. Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 10, at 30.
As a result, the legality of the merger should turn on the answer to the following fact-intensive question: Would Anthem-Cigna obtain lower provider rates from hospitals and doctors because of its exercise of unlawful monopsony power in the upstream market where it negotiates rates with healthcare providers? Given the way it resolved the case, the District Court never reached that critical question. Therefore, I would remand for the District Court to expeditiously decide that question in the first instance.
II
The majority opinion portrays this as an easy case for blocking the merger. If the law and the facts were as described by the majority opinion, I would agree with it. But in my view, the law and the facts are not as described by the majority opinion. Indeed, the majority opinion outflanks even the Government’s position on the law and the facts.
First, the Government accepts as a given that a defendant in a Section 7 case may rely on a merger’s efficiencies to show that a merger would not be anti-competitive despite the increased market concentration and market shares that would result from the merger. But the majority opinion — echoing the District Court — does not accept that legal principle as a given. On the contrary, the majority opinion casts doubt on this Court’s opinions in Baker Hughes and Heinz, and on whether Section 7 analysis allows a court to take account of a merger’s efficiencies as a defense in a merger case. The majori *379 ty opinion says that the Supreme Court’s 1967 decision in FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), is the essential precedent on this question. For the majority opinion, we are apparently stuck in 1967. The antitrust clock has stopped. No General Dynamics. No Continental T. V. v. GTE Sylvania. No Baker Hughes. No Heinz. No updated Merger Guidelines.[3] To reiterate, not even the Government makes that far-reaching argument. For good reason. As one hornbook aptly puts it, the “truly important point is that no modern observer, and no modern court, espouses the old FTC v. Procter & Gamble Co. (1967) position that efficiencies might be reason to condemn a merger.” Ernest Gellhorn, William E. Kovacic & Stephen Calkins, Antitrust Law and Economics in a Nutshell 463 (5th ed. 2004); see also Baker Hughes, 908 F.2d at 985 (“Indeed, that a variety of factors other than ease of entry can rebut a prima facie ease has become hornbook law.... [OJther factors include industry structure, weakness of data underlying prima facie case, elasticity of industry demand, inter-industry cross-elasticities of demand and supply, product differentiation, and efficiency.”) (emphasis added).
Fortunately, the majority opinion in the end does not actually hold that there is no efficiencies defense available in Section 7 cases. The majority opinion merely suggests as much in dicta — perhaps portending a return to 1960s antitrust law in some future merger case. For purposes of this case, however, the majority opinion simply says that even assuming such a defense exists under the law, the defense would not be satisfied here. The majority opinion’s lack of a square holding on the role of efficiencies in merger cases is some measure of good news because it means that future district courts and future panels of this Court still must follow General Dynamics, Baker Hughes, and Heinz, not the ahistorical drive-by dicta in today’s majority opinion.
Second, on the facts, the majority opinion never, fully accepts the two key facts in this case: First, provider rates will be lower; and second, the savings from those lower rates will be passed through to- employers. The first fact is conceded by the Government, and the second fact is undeniable given the nature of this market and the contractual relationships between employers and insurers.
As mentioned above, the key difference between this horizontal merger and some horizontal mergers is that the increased savings obtained by the merged company in the upstream supply market in this case would be passed through directly to consumers. That one fact makes this merger unusual. In the ordinary case of a merger where the merged firm would have market power, it can be difficult for the merged firm to demonstrate that a substantial portion of the efficiencies resulting from the merger would actually be passed through to consumers instead of being retained by the merging companies. See, e.g., FTC v. Staples, Inc., 970 F.Supp. 1066, 1090 (D.D.C. 1997) (“Staples and Office Depot have a proven track record of achieving cost savings through efficiencies, and then passing those savings to customers in the form of lower prices. However, in this case the defendants have projected a pass through rate of two-thirds of the savings while the evidence shows that, historically, Staples has passed through only 15-17%.”); see also U.S. Department of Justice & *380 Federal Trade Commission, Horizontal Merger Guidelines § 10, at 31 (“The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to customers.”). However, in this case, a high pass-through rate is practically guaranteed because, under the contractual arrangements that apply in the relevant market, the employers pay healthcare providers for the healthcare. services provided to employees. So if the price of healthcare services is lower, the employers directly benefit because Anthem-Cigna’s employer-customers pay those lower prices.
The only real factual question concerning the effects of the merger on large employers should be whether the savings to employers from lower provider rates would exceed the increased fees employers would pay to Anthem-Cigna for the insurance services. As I have explained, the record evidence overwhelmingly indicates that the savings to employers from lower provider rates would greatly exceed the increased fees they would pay to Anthem-Cigna for the insurance services.
But the majority opinion does not conduct that key inquiry. That is because the majority opinion does not fully accept the fact, undisputed by the parties, that provider rates would actually be lower as a result of this merger. And the majority opinion likewise does not accept that any possible cost savings would actually be passed through. So for the majority opinion, there are no cognizable efficiencies to consider in the first place and no need to assess whether the cost savings for employers are greater than the increased fees paid by employers.
The majority opinion offers up a smorgasbord of reasons to think that provider rates would not be lower or would not really be passed through, ranging from provider “abrasion,” to secret Anthem plans to dramatically raise the fees it charges employers, to Anthem’s supposed inability to force or negotiate with providers to obtain Anthem rates for Cigna customers, to friction between the Anthem and Cigna CEOs. All of that seems at best highly speculative. The plural of anecdote is not data. Of course, lots of bad things could happen after the merger. But the courts have to assess what is likely. See Baker Hughes, 908 F.2d at 984 (“Section 7 involves probabilities, not certainties or possibilities.”). The majority opinion seems to be accepting the worst-case possibility rather than determining what is likely. And the overwhelming evidence of what is likely is that provider rates would go down, that the savings would be passed through to employers, and that the savings to employers would greatly exceed any increase in fees paid by employers.
To the extent the majority opinion acknowledges even obliquely that prices possibly could go down after the merger, the majority opinion retorts that quality will also go down after the merger. But quality of what? As noted earlier, there is no persuasive evidence that the quality of medical care provided by hospitals and doctors would decrease. Nor is there any convincing evidence that the quality of services provided to employers by insurers would meaningfully decrease. Not to mention, does any supposed decrease in quality really rise to the level of $1.7 to $3.3 billion annually? The record discloses no meaningful effort to quantify or calculate the supposed decrease in quality.
The majority opinion also says that Cig-na provides programs that help reduce utilization and that those could be jettisoned after the merger. But there is no good reason to think that those programs would be jettisoned rather than adopted by the merged company. Moreover, this *381 speculation does not account for the fact that Anthem already has lower utilization rates than Cigna. So is it not likely that Cigna customers would utilize health care more after the merger than they do now.
[[Image here]]
The analysis of a merger’s effects necessarily entails a predictive judgment. Courts are often ill-equipped to render those predictive judgments in cases of this sort. But here, we have a far clearer picture of what will unfold than we often do. We know that Anthem-Cigna would be able to negotiate lower provider rates; indeed, even the Government admits as much. And we know that those savings will be largely passed through to employers because that is the way the market and contracts are structured. After all, the whole point of the provider rates negotiated by insurers is to establish the prices that the employers will pay. If the prices are lower, the employers will pay less. And we know, furthermore, that any cost savings to employers likely would greatly exceed any increase in fees paid by employers.
On this record, this horizontal merger therefore would not substantially lessen competition in the market for the sale of insurance services to large employers. The District Court clearly erred in concluding otherwise, and I disagree with the majority opinion’s affirmance of the District Court’s judgment.
The problem for this merger, if there is one, is in its effects in the upstream market — namely, in its effects on hospitals and doctors as a result of Anthem-Cigna’s enhanced negotiating power. Therefore, my approach to this case would require District Court resolution of one remaining question: Would Anthem-Cigna obtain lower provider rates from hospitals and doctors because of its exercise of unlawful monopsony power in the upstream market where it negotiates rates with providers? If yes, then Anthem-Cigna concedes that the merger is unlawful and should be enjoined. If no, then the merger is lawful and should be able to go forward. I would vacate the District Court’s judgment and remand for the District Court to expeditiously resolve that fact-intensive question in the first instance.
I respectfully dissent.

. To be sure, if a price decrease were accompanied by a substantial reduction in quality, that fact would raise a separate concern about this merger. But here, the record does not contain sufficient evidence, beyond some speculation and guesswork by the Government, that the merger would cause an actual decrease in the quality of medical service provided to employers by hospitals and doctors, or in the quality of customer service provided to employers by insurers.
Relatedly, the Government suggests that the current Cigna employer-customers, once switched over to Anthem after the merger, would utilize healthcare services more often. The Government argues that the higher utilization would cancel out some of the cost savings that the employer-customers would otherwise achieve. That suggestion is likewise highly speculative and does not square with the record, which shows that current Anthem employer-customers have lower utilization rates than the current Cigna employer-customers. See J.A. 480.

. Baker Hughes was authored by Judge Clarence Thomas and joined by Judge Ruth Bader *377 Ginsburg and Judge David Sentelle..

. The concurrence goes so far as to say that even if "prices will go down,” that "proves nothing by itself.” Concurring Op. at 369.